Ajene KIGOZI, formerly known
as Walter E. Johnson Jr.,
Appellant,

v.

UNITED STATES, Appellee.

Nos. 03–CF–1181, 07–CO–684.

District of Columbia Court of Appeals.

Argued Feb. 19, 2009.
Decided June 14, 2012.

644

Richard H. Menard Jr., with whom Jeffrey T. Green, Washington, and Debbie Kim were on the brief, for appellant.*

Anne Y. Park, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, Chrisellen R. Kolb, Benjamin Friedman, John P. Carlin, and James Sweeney, Assistant United States Attorneys, were on the brief, for appellee.

─────────

* Appellant also filed a *pro se* brief and letters to the court.

Before GLICKMAN, Associate Judge, RUIZ, Associate Judge, Retired,** and FARRELL, Senior Judge.

RUIZ, Associate Judge, Retired:

Ajene Kigozi (formerly known as Walter E. Johnson Jr.), was tried by jury and convicted in the Superior Court for the murder of Parris Lynch.[1] He filed a motion pursuant to D.C.Code § 23–110 (2001) seeking reversal of his convictions on the ground of ineffective assistance of counsel claiming, among other alleged deficiencies, counsel's failure to consult with and call an expert witness who could testify about the PCP intoxication of the decedent, whose dying declarations formed the centerpiece of the government's case. The Superior Court denied appellant's motion after a hearing. We agree with appellant's contention that the trial court erred in denying his claim of ineffective assistance of counsel. We, therefore, reverse appellant's convictions and remand his case for a new trial.

Appellant also contends that admission of the decedent's out-of-court accusations violated the Confrontation Clause and that the statements should not have been admitted under the exception to the hearsay rule for dying declarations without a particularized finding that the statements were reliable. In view of our disposition

remanding the case for a new trial, we need not decide these challenges to the admissibility of the dying declarations, which are raised for the first time on appeal. However, as the government's case was centered on the decedent's statements, on remand the trial court will need to address appellant's claims that the accusatory declarations of the decedent were erroneously admitted in violation of the Confrontation Clause and were too unreliable to come within the hearsay exception for dying declarations. These issues were not considered at the first trial, and further factual development of the circumstances surrounding Lynch's accusations, considered in the light of relevant precedent, will be required in a renewed prosecution to determine 1) whether the statements were testimonial in nature and, if so, whether the Confrontation Clause excepts testimonial out-of-court statements that are made in the face of impending death;[2] and 2) whether they satisfied the hearsay exception for dying declarations.

## I. Facts

### A. The Trial

The government presented evidence in its case-in-chief that, at approximately 1:00 p.m. on November 23, 2001, Parris Lynch was shot seven times at close range while

** Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

1. Appellant was convicted of first-degree premeditated murder while armed, in violation of D.C.Code §§ 22–2101, –4502 (2001); possession of a firearm during a crime of violence (PFCV), in violation of D.C.Code § 22–4504(b) (2001); and carrying a pistol without a license (CPWL), in violation of D.C.Code § 22–4504(a) (2001).

2. The medical condition of the victim is important to the primary purpose inquiry to the extent it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one. The victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public.

*Michigan v. Bryant*, —— U.S. ——, 131 S.Ct. 1143, 1159, 179 L.Ed.2d 93 (2011); *see Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

seated in the driver's seat of a car at the intersection of Chesapeake Street and Southern Avenue, S.E. Still conscious, Lynch attempted to flee the scene in his vehicle, heading north on Southern Avenue toward Wheeler Road (and a hospital) where he rear-ended a bus. He was taken by ambulance to a nearby elementary school and then, by helicopter, to Prince George's County Hospital Center where he died later that night.

Several witnesses who were in the area of the shooting testified at trial. Lawrence Brown, a heroin addict and dealer who knew Lynch, testified that at approximately 11:00 a.m., he was approached by appellant who asked Brown if he had seen Lynch. Brown told appellant that he had not and walked around the back side of a nearby McDonald's restaurant. About three to five minutes later,[3] Brown heard gunshots and noticed a car, which he recognized as Lynch's, swerving off the road. Leo Benbow testified that as he exited a bus at the nearby McDonald's, he observed two men arguing approximately thirty to forty feet away, one of whom was seated in a car and the other was standing outside that car's passenger window. Benbow said he heard one of the men say, "I want my damn money," and saw the man outside the car put a gun inside the car and fire approximately four times. Benbow then saw the car speed through the McDonald's parking lot and hit a bus. Appellant's fingerprint was found on Lynch's car, above the passenger door, and the prosecutor argued this corroborated that it was imprinted when appellant leaned into the car to shoot Lynch.

None of the witnesses who testified at trial identified appellant as the shooter. Benbow said that he could "[n]ot clearly" see the shooter, and saw only his back. On cross-examination, Benbow testified that appellant did not match the description of the shooter he had given the police at the time and was not the man who fired the shots.

Robert Williams testified that he was in a car three cars behind Lynch's when he heard gunshots. He could see an arm holding a firearm into the front-passenger seat window of Lynch's car, and subsequently watched as the gunman fled past Williams's car as Lynch's car cut through the nearby McDonald's parking lot and then up Southern Avenue. Williams testified that he turned his head and did not look straight at the shooter's face. Williams also did not identify appellant in court. He testified that he managed only to "g[e]t a glance" at the shooter, and on cross-examination admitted that appellant did not match the description of the shooter he had given the police.

Two other witnesses provided evidence of the shooting that also tended to exculpate appellant. A stipulation was entered that Latese Alexander, who saw the shooter immediately after the shots rang out, identified someone other than appellant from a photo array. At a nearby store, Cynthia Gaskins overheard a person speaking on the phone shortly after the shooting, claiming to have "just capped" someone "for Ray–Ray." Gaskins described the caller as wearing his hair in plaits, which did not resemble appellant's hair style at the time; appellant was not known as Ray–Ray.[4]

---

3. That it was undisputed Lynch actually was shot around 1:00 p.m. and not at 11:00 a.m., as Brown recalled, was a fact evidently not raised either in cross-examining Brown or during defense counsel's closing argument.

4. Metropolitan Police Department Officer Leslie Geisz, who was on patrol in the area at the time, testified that she "heard approximately eight gunshots ring out" from the intersection of Chesapeake Street and Southern Avenue and then the sound of "a car speeding

The centerpiece of the government's case was Lynch's three statements, made shortly before he died, identifying appellant as the man who shot him. Within five minutes of the collision between Lynch's car and the bus, Christopher Wittington, a Prince George's County Fire EMT emergency response technician, arrived on the scene. Observing "a large amount of blood" and assessing Lynch's condition as critical, Wittington and his crew boarded Lynch onto an ambulance. Wittington testified that Lynch "kept repeating that he could not breathe." Once in the ambulance, Wittington asked Lynch a series of questions to assess his mental status; Lynch made appropriate responses, all the while continuing to state that he could not breathe. Several times, Lynch asked Wittington whether he was going to die and was "somewhat combative," flailing his arms around and trying to get off the stretcher.

While in the ambulance, Lynch "looked at [Wittington] square in the eyes," and said, "I need to tell you something." Wittington leaned forward and turned his head so "that [his] right ear was just a matter of several inches from [Lynch's] mouth," and Lynch stated, "Walter Johnson shot me." (Walter Johnson is appellant's former name). Wittington, who was dressed in a Prince George's County Fire EMT uniform, responded that he was not a police officer, but that he would inform the detectives.

Once the medivac helicopter arrived, Officer Chris Perkins, a paramedic assigned as a rescue technician with the U.S. Park Police aviation unit, entered Lynch's ambulance where he asked for the patient's name. He heard Lynch say, "Walter Johnson" and asked, "Is that your name?" to which Lynch responded, "Walter Johnson shot me." Officer Perkins repeated this statement back to Lynch, asking "Walter Johnson shot you?" and Lynch responded, "Yeah." Perkins testified that Lynch appeared "slightly agitated," "in respiratory distress," and that he appeared uncomfortable lying down because he was "shifting," as if "trying to sit up."

Lynch complained that he could not breathe and Officer Perkins assured him that "[he] would have [him] at the hospital in a couple of minutes." Lynch responded, "I know I'm gonna die." Officer Perkins assured Lynch he would not and that he would be at the hospital shortly. For the third time, Lynch repeated, "Walter Johnson shot me." Lynch's condition rapidly deteriorated during the flight to the hospital. According to Officer Perkins, Lynch became "[s]omewhat" disoriented in that he kept "making repetitive statements," and was "very combative." He made no further coherent statements and died later that night.

In addition to challenging the identity of appellant as the gunman through the cross-examination of Benbow and Williams, appellant presented the testimony of Curtis Freeman, who had known appellant for two months before Lynch's death. Freeman testified that shortly before the shooting, he had been conversing with Lynch for about ten minutes while Lynch sat in his car on Chesapeake Street. According to Freeman, Lynch was "high" and appeared to be under the influence of "PCP water"[5]; his eyes were "real glassy" and he was "shaking," "stuttering," and

off." In her police cruiser, she followed Lynch's car up Southern Avenue toward Wheeler Road where it hit the back of a bus at the intersection. Officer Geisz did not see the shooter.

5. "PCP water" is the PCP-laced liquid in which cigarettes are dipped to smoke PCP.

"couldn't hardly talk." Freeman said that as he was walking away from Lynch's car, a "dude," someone other than appellant, approached the car. Thereafter, Freeman heard gunshots and turned; he saw that same individual firing a gun into Lynch's car from outside the passenger side, and run away.[6]

As proof of appellant's motive to kill Lynch, the government presented testimony explaining that Lynch and appellant, who were friends and sold drugs together, had purchased "some bad stuff," or bad drugs. Though Lynch had been able to get rid of his share of the drugs, appellant had not and remained bitter about the transaction. According to Catrina Stephenson (the mother of Lynch's children), Dorothy Murrell (Stephenson's mother), and Latoya Morton (Lynch's girlfriend), appellant had called several times looking for Lynch, demanding his money and even threatening to kill him. These repeated threats, the prosecutor argued in closing, evidenced appellant's vengeful motive for killing Lynch.

Appellant presented an alibi defense. Several witnesses, members of his family and friends, testified that he was at home all day on the day Lynch was shot, and that Lynch had visited appellant at his home for a short time around noon, the day before, Thanksgiving Day. To explain the presence of appellant's fingerprint on Lynch's car, the defense asked Freeman about Lynch's visit to appellant's house on Thanksgiving. Freeman testified that Lynch had proposed that they visit "[his] man's house" and that he had gone in the car with Lynch to appellant's home. At one point, according to Freeman, appellant had leaned against the passenger side of

the car to talk to Lynch before he drove off.

Appellant could not, however, effectively challenge Lynch's repeated accusations to the emergency personnel that "Walter Johnson shot me." In opening statement defense counsel emphasized that appellant and Lynch were long-time friends, and that Lynch knew appellant by his "street name" "Butch," and not as "Walter Johnson." Thus, he argued, Lynch's accusations that "Walter Johnson" shot him were not directed at appellant. Counsel also stated that Freeman would testify that Lynch had been smoking PCP right before he was shot, and that the medical records showed Lynch had tested positive for PCP shortly after he was shot. Lynch's impairment as a result of PCP intoxication was not counsel's primary argument, and he concluded his opening statement by going back to his "Butch" argument, saying that Lynch had not clarified that "Walter Johnson" and "Butch" were the same person, although he could have because he had been "conscious" and "alert" when he arrived at the hospital. By closing argument, however, counsel was struggling to undermine the credibility of Lynch's accusations by saying he had been high on PCP, "a hallucin[ogenic] drug, [where] you say things you don't really know what you are saying." This assertion had some support in the evidence: hospital records revealed the presence of PCP in Lynch's urine and Freeman testified that when he spoke to Lynch shortly before the shooting, he appeared to be high on PCP, although he did not say (as counsel had proffered in opening statement) that he had seen Lynch smoking PCP. Additionally, on cross-examination, Officer Perkins testified that Lynch was acting like a per-

---

6. Freeman ·was impeached with having provided inconsistent descriptions of "the dude" who fired into Lynch's car.

son high on PCP, but he also said that persons who suffered head trauma (as Lynch had when his car crashed into the bus) also showed such symptoms and at the time it was "[n]ever in [his] mind" that Lynch was high on PCP.[7] To counter the evidence that Lynch might have been high on PCP when he accused appellant of shooting him, the government relied on the evidence presented by the medical examiner, Dr. Jack Titus, who signed the report of the autopsy of Lynch's body. The autopsy report did not say that Lynch had PCP.[8] Referring to the hospital records that showed the presence of PCP in Lynch's urine, Dr. Titus explained that "[because] the urine . . . is a repository[,] . . . [that] we find drugs in the urine, [is] not indicative of it being in the blood stream and having an active effect." In rebuttal, the prosecutor used Dr. Titus's testimony to argue that this was "proof positive" that Lynch was not high on PCP when he accused appellant of shooting him.

The jury found appellant guilty of all charges; the trial court sentenced him to thirty-five years of imprisonment.

## B. *The § 23–110 Hearing*

Represented by new counsel, appellant filed a motion for a new trial, pursuant to D.C.Code § 23–110, in which he argued

7. Defense counsel sought to inquire as to whether Officer Perkins knew of the effects of PCP on its user, but the trial court precluded such questioning, because "[Officer Perkins] is not an expert."

8. The one-paragraph "Opinion" of the autopsy report concludes as follows: "The deceased had not been consuming alcoholic beverages prior to death. Postmortem toxicology testing for drugs was positive for ketamine."

9. Appellant's § 23–110 motion cited a number of other alleged deficiencies in counsel's performance. On appeal, counsel for appellant narrow their challenge to the failure to

that his trial counsel was ineffective because he failed to consult and present an expert to fully develop the relevance of Lynch's positive PCP urine test, which indicated that he was high on PCP at the time of the shooting, and thereby cast doubt on the reliability of his statements accusing appellant.[9] An evidentiary hearing was held in the Superior Court during which appellant's trial counsel, Kenneth Robinson, testified. Robinson testified that he had been advised by appellant's prior counsel that the medical records showed the presence of PCP in Lynch's system and that prior counsel "was going to get an expert to evaluate that and testify because there was a dying declaration in the evidence." Appellant had explicitly requested that Robinson consult an expert; Robinson admitted he never did so. Robinson explained that he believed appellant could not afford the expert's fee and that, though he never filed a request with the court (or inquired), he believed the trial court would not have permitted him to consult an expert at court expense because he had been retained by appellant rather than appointed by the court. Robinson believed that appellant's prior counsel "would have gotten an expert," and stated that "[i]n hindsight, [it would] have been nice if I'd have had an expert" to explain the effects of PCP to the jury. Although

call a drug expert, discussed in the text, and three other deficiencies in counsel's performance: (1) that counsel should have called an expert on gunshot residue to explain that its absence in the car or on Lynch's person undermined the government's account that the shooter leaned into the car and shot Lynch at close range, diminishing the inculpatory force of the presence of appellant's fingerprint on the passenger-side rear window frame, (2) that counsel was ineffective in cross-examining Brown, see note 3, *supra;* and (3) that counsel failed to request an alibi instruction. We note that the jury was given an instruction on alibi.

Robinson regretted that he did not consult an expert, he defended his representation.

Dr. Kenneth Dretchen, a nationally recognized pharmacology expert and Chair of the Department of Pharmacology at the Georgetown University Medical Center, also testified at the evidentiary hearing. He explained how PCP is metabolized in the body and its effects. Dr. Dretchen stated that the presence of PCP in the urine reflects the drug's simultaneous presence in the blood stream—testimony that contradicted the trial testimony of the medical examiner presented by the government and the prosecutor's rebuttal argument. He testified that the PCP would be expected to have entered the brain, and that PCP "avidly binds to the brain and so blood levels of PCP usually are relatively low to begin with." Despite being unable to tell exactly how much PCP was in Lynch's system because a qualitative not a quantitative test had been done at the hospital when Lynch was admitted, nor how long the PCP had been there, Dr. Dretchen opined that the test performed on Lynch's urine had a "pretty high cutoff level" for detection of PCP. He said that only a small amount (3–5 milligrams) of PCP can have an effect and that the effects of PCP can last two to three days. He explained that the likely reason PCP was not detected in Lynch's blood stream was the dilution effected by the extremely large volume of fluids with which Lynch was transfused during the emergency treatment after he was shot, and at the hospital, which was "more than double normal blood volume." Dr. Dretchen testified that the effects of PCP can include sedation, confusion, delirium, disorientation, aggressive and combative behavior, hallucinations and visual disturbances. Finally, Dr. Dretchen opined that the combativeness, confusion and disorientation the EMT personnel observed when they treated Lynch could be symptoms of PCP intoxication.

The trial court denied appellant's motion for a new trial, concluding that "[Dr. Dretchen]'s proposed testimony, even if permitted, would not have significantly affected the outcome [of trial]." This appeal followed.

## II. Ineffective Assistance of Counsel

We review a trial court's denial of a § 23–110 motion for new trial for abuse of discretion. *Minor v. United States*, 647 A.2d 770, 776 (D.C.1994). The elements of an ineffective assistance of counsel claim are well established: first, "the defendant must show that counsel's performance was deficient," and, second, "the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). " '[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.' ... [W]e accept the trial court's findings of fact unless they lack evidentiary support in the record. We review the trial court's legal determinations *de novo.*" *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc) (citations omitted) (quoting *Strickland*, 466 U.S. at 698, 104 S.Ct. 2052).

### A. *Counsel's Performance*

"In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052. The adversarial process on which our system relies requires adequate preparation by defense counsel. Thus, it has long been the rule

that counsel's investigation before trial is an essential component of effective representation and can be as important to the defense as counsel's performance during trial. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. Thus, counsel's arbitrary or ill-considered decision to forgo relevant pre-trial investigation is constitutionally deficient. *See Wiggins v. Smith,* 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ("[C]ounsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

■ To show that his trial counsel's performance was deficient, appellant must "show[ ] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. "Accordingly, the defendant's burden is to show that 'counsel's representation fell below an objective standard of reasonableness.'" *Cosio,* 927 A.2d at 1123 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). To that end, we have explained, "it is objectively unreasonable for defense counsel to make an uninformed decision about an important matter without a justification for doing so." *Id.; see also Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances.").

We extensively addressed this aspect of counsel's obligation in *Cosio.* There, the defendant had been charged with sexually abusing his younger half-sister, 927 A.2d at 1110, who was "the key witness for the prosecution." *Id.* at 1132. Upon review of the investigation performed by trial counsel preceding trial, we noted counsel's failure to take the crucial step of questioning those close to the defendant and his sister about the nature of their relationship. Understanding their relationship was important to the defense because at trial the government explained that the sister's seven-year delay in reporting the abuse was explained by her fear of the defendant, who had beaten her before. Following the trial, however, it was discovered that in fact the defendant's co-workers had seen the two together several times, that she sought him out, and that from these interactions it could be inferred that she was *not* afraid of her brother. *Id.* at 1116. Because the sister's credibility was "crucial" to be government's case, *id.* at 1128 n. 21, trial counsel's failure to inquire further into the nature of the defendant's relationship with his sister was "objectively unreasonable, and hence ... counsel's performance was constitutionally deficient." *Id.* at 1131; *see also id.* at 1120 ("Such evidence ... would not only throw into question the whole issue of her delay in disclosure, but also throw into question her credibility in that she had very forthrightly said she was afraid of him because of the beatings." (internal quotation marks omitted)).

The facts of this case compel the same conclusion. Both parties agree that "[t]he crucial issue at trial was whether Lynch was actively under the influence of PCP at the time of the shooting so as to undermine the reliability of his dying declaration." We find it unreasonable that counsel, upon learning pretrial that the key witness for the prosecution may have been under the influence of a mind-altering drug, did not further investigate its poten-

652

tial for impeaching this witness's damning statements. As we said in *Cosio,* "we have no doubt that any competent defense attorney would have appreciated the need to investigate [the credibility of the key witness for the prosecution]." *Id.* at 1128. Such an inquiry would have required, in this case, that counsel at least consult an expert about the possibility that Lynch was under the influence of PCP, taking into account the results of the testing done when he was admitted to the hospital, and the effect that PCP could have had on Lynch's ability to accurately perceive, recall, and report the identity of his assailant. Counsel should have been alerted to the fact that the government's expert, Dr. Titus, would take a contrary position, as the autopsy report signed by Dr. Titus referred only to the presence of ketamine.[10] See note 8, *supra.* Appellant's trial counsel did not consult an expert, despite his client's explicit request and his knowledge that prior counsel was planning to retain an expert. *Cf. id.* at 1131 ("Nor is this a case of 'diligent counsel ... draw[ing] a line when [he has] good reason

to think further investigation would be a waste [of time or resources.]'" (alterations original) (quoting *Rompilla v. Beard,* 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005))). Although counsel testified that he did not do so because he did not *think* appellant could afford the expense even though he had been retained as counsel and appellant had paid his fees, albeit in "drips and drabs," counsel did not present the issue to appellant's family and did not request assistance from the court, pursuant to D.C.Code § 11–2605.[11]

The government argues that counsel's decision not to call an expert was "a reasoned tactical decision," made after a "cost-benefit analysis," because the average juror would "know about PCP and its general effects." It is true that we will not second-guess true tactical decisions. *See Carter v. United States,* 475 A.2d 1118, 1123 (D.C.1984) ("Tactical decisions which may go awry at trial do not constitute ineffectiveness, nor do errors in judgment which become apparent in light of well-reasoned hindsight.") (internal citations omitted); *Parker v. United States,* 601

10. Appellant was given high doses of ketamine at the hospital to facilitate insertion of a breathing tube. According to Dr. Dretchen, this explained why some of the ketamine would have been present in Lynch's blood, *but not the PCP.*

11. The parties dispute whether appellant would have been able to obtain an expert at court expense had counsel made the request. D.C.Code § 11–2605 (2001) provides:

Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court shall authorize counsel to obtain the services.

*Id.* § 11–2605(a). The government argues that section 11–2605 is intended for indigent defendants only, and does not apply to defen-

dants who have retained their own counsel. Appellant focuses on the language of the statute, which refers to a defendant who is "financially unable to obtain ... services necessary for an adequate defense[.]" We need not come to a definitive interpretation of the statute because, assuming (as counsel believed) that appellant was "financially unable" to pay for the expert he requested, counsel should have at least inquired whether the court would "authorize counsel to obtain the services" because they were "necessary for an adequate defense."

Although questions about appellant's ability to afford an expert may be relevant to the reasonableness of counsel's decision not to consult an expert, the government, does not argue that, to prevail on his claim of ineffective assistance of counsel, appellant must show *that resources would, in fact, have been available* (from appellant, the court, or any other source) to pay for the expert's fees.

A.2d 45, 53 (D.C.1991) (refusing to "second guess" the tactical decision of trial counsel). But the decision to rely on what lay jurors may know about the "general effects" of PCP cannot be reasonable without knowing what an expert would be able to contribute to the jury's understanding of the evidence available to the defense and its importance in defending against the government's case-in-chief. In this case, an initial question was technical in nature: whether test results supported that Lynch was under the effects of PCP. This question, which was presaged by Dr. Titus's autopsy report, was preliminary to—and separate from—the issue about the effects of PCP that counsel thought were common knowledge. If Lynch had PCP in his system, the jury would have had to ask, how might Lynch have been affected in ways that were specifically relevant to his accusations of appellant? A lay juror was unlikely to be able to answer either question without assistance, even assuming (as defense counsel believed) that jurors would know about the "general effects" of PCP. By definition, a cost-benefit analysis cannot be made without knowing the costs and the benefits. Dr. Dretchen's testimony at the 23–110 hearing demonstrates that there were real benefits to be gained by calling an expert to address the autopsy report, cross-examine Dr. Titus's testimony, and present evidence that the urine test revealed Lynch was under the effect of PCP. Therefore, as was the case in *Wiggins,* "counsel [was] not in a position to make a reasonable strategic choice ... because the investigation supporting the[ ] choice was unreasonable." 539 U.S. at 536, 123 S.Ct. 2527; *see Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

■ The importance of the accusations made by Lynch, "the key witness for the prosecution," *Cosio,* 927 A.2d at 1132, was evident. Moreover, the manner in which his "testimony" was presented, by means of three statements made as he was contemplating death, was likely to have a potent impact on the jury unless their reliability was credibly undermined. Dying declarations are admitted as an exception to the hearsay rule because they have historically been presumed reliable. *See Bell v. United States,* 801 A.2d 117, 126 (D.C.2002). At the 23–110 hearing, counsel candidly admitted that a dying declaration is "very powerful," and that he had "only won one case ever where there was a dying declaration out of all [the] cases [he had] ever won." In short, counsel was well aware that evidence was required to overcome the presumed reliability of Lynch's "powerful" dying declarations. In this case, the only hard evidence with which to do so was the PCP detected in Lynch's urine. Consultation with an expert was necessary to develop that evidence and explore why there was no PCP found in Lynch's blood as a way of countering the autopsy report's opinion, and establishing that Lynch's declarations could have been rendered unreliable by the effects of PCP. Dr. Dretchen would have testified that "because PCP was in [Lynch's] urine, it was necessarily also in his blood," and would have collected primarily in Lynch's brain. He would have countered Dr. Titus's testimony by explaining that the massive transfusions immediately after Lynch was shot were the likely reason why PCP had not been detected in Lynch's blood. He would have added information otherwise absent from the record: that the "high cut-off" in the PCP test that had been administered suggested that Lynch had enough PCP in his system to have an effect, that

Lynch's behavior was consistent with PCP intoxication, and that PCP could cause not only the combativeness the emergency personnel observed, but also confusion, disorientation, and hallucination. Because trial counsel's investigation into what an expert could contribute to challenge the credibility of Lynch's dying declarations was unreasonable, the decision not to call an expert at trial cannot be considered a "tactical" choice to which the court will defer. *See Wiggins,* 539 U.S. at 536, 123 S.Ct. 2527.

■ Moreover, it is not enough to suggest that even had counsel conducted a thorough investigation and consulted an expert, he *could* have decided not to introduce the expert evidence at trial. *Cosio,* 927 A.2d at 1126 ("Deficient investigation cannot be excused on the ground that a competent attorney, aware of the evidence that an adequate investigation would have uncovered, *could* have made an informed judgment to pursue an alternative strategy and not utilize that evidence at trial."). First, as we discuss in the following section, there is no apparent reason why counsel would have elected not to present a medical expert such as Dr. Dretchen. Second, a defendant's constitutional guarantee of a competently prepared defense requires more than a defense that can be "salvage[d] ... with the benefit of 'tactics as disclosed by hindsight.'" *Chatmon v. United States,* 801 A.2d 92, 108 (D.C.2002) (quoting *Lane v. United States,* 737 A.2d 541, 549 (1999)); *see also Cosio,* 927 A.2d at 1136 (Ruiz, J., concurring) ("[T]he court may not turn a blind eye to counsel's patently sub-par actual performance and judge it acceptable because some other, competent counsel could ... have arrived at the same decision."). Whether a defendant has received his Sixth Amendment guarantee to counsel is measured against an objective standard, but it is tested in

the context of his case and warrants judicial review based upon "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Here, counsel's decision not to take even the first step of consulting an expert was patently unreasonable and fell below what is expected of competent counsel.

### B. *Prejudice*

■ Having found that trial counsel's performance was deficient, we must now consider whether that deficiency substantially prejudiced appellant's defense. Appellant must "show[ ] that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. "[O]ur review of the prejudice prong is *de novo.*" *Chatmon,* 801 A.2d at 110.

In *Cosio* we explained the "dual aspect of the prejudice inquiry required when the error in question is an investigative omission resulting in counsel's failure to discover evidence favorable to the defense." 927 A.2d at 1132. This inquiry, based on the Supreme Court's holding in *Wiggins,* first requires a determination as to "whether there is 'a reasonable probability that a competent attorney, aware of [the favorable evidence], would have introduced it at [trial] in an admissible form.'" *Id.* (alteration original) (quoting *Wiggins,* 539 U.S. at 535–36, 123 S.Ct. 2527). Second, "we must ask whether, 'had the jury been confronted with this ... evidence, there is a reasonable probability that it would have returned with a different [verdict].'" *Id.* (alteration original) (quoting *Wiggins,* 539 U.S. at 535–36, 123 S.Ct. 2527).

In this case, expert testimony went directly to the central issue in appellant's trial—the reliability of Lynch's dying dec-

larations. Thus, for the reasons we have already discussed, we have no doubt "there is at least a reasonable probability that any competent defense attorney would have recognized the attractiveness of using [the medical expert testimony] to cast doubt on [the] veracity [of the key witness for the prosecution]." *Id.* at 1133. In *Cosio,* we noted that defense counsel himself admitted that "in a case like this ... it's almost ... assumed ... that I would investigate the relationship between the complainant and Mr. Cosio; it's just ... basic, ... it is just implicit in this type of case that we're going to do that." *Id.* at 1119. Although here defense counsel cited cost as an excuse for not consulting an expert, he also conceded that appellant's prior lawyer would have retained an expert and that appellant had requested that he do so.

We recognize that trial counsel gave another reason to discredit the dying declarations—that Lynch did not use appellant's street name "Butch"—and also presented an alibi defense. However, Lynch's accusations cast doubt on the alibi witnesses, who were impeached for bias because they were appellant's friends and members of his family. Even assuming that the "Butch" argument seemed persuasive to counsel at the time, it was highly subjective and difficult to prove, as it required persuading the jury that the deceased Lynch meant something other than what appeared to be a straightforward statement: "Walter Johnson [i.e., his long-time friend, appellant] shot me." [12] It appears to have been an uphill, second-best alternative when a more direct challenge to Lynch's lucidity, based on documented hospital tests and expert medical evidence was available. Moreover, there was an obvious tension be-

tween counsel's twin arguments that Lynch was high on PCP, yet alert enough to have been able to clarify that he meant to accuse appellant when he mentioned "Walter Johnson." The mental gymnastics required may have been too much to ask of a jury faced with three unequivocal dying declarations. There was no conflict, however, between presenting the alibi defense and introducing expert testimony on the likelihood that Lynch was under the effect of PCP and how it could have distorted Lynch's cognition. To the contrary, the two defenses were mutually supportive. We think it cannot be gainsaid that credible evidence impeaching the government's key witness is an elementary component of a proper defense, and that, armed with expert evidence such as that presented by Dr. Dretchen at the 23–110 hearing, competent defense counsel would have presented it to the jury.

Whether there is a reasonable probability that the jury would have returned a different verdict had the expert evidence been presented, is a more difficult question. Nevertheless, appellant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case," *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052; rather appellant "must show [only] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

12. The government's brief on appeal does not defend the "Butch" argument as a reason-able, alternative means to challenge the credibility of Lynch's dying declarations.

Here, expert testimony linking the PCP found in Lynch's urine to PCP in the blood and specifically, the brain, and explaining why no PCP was detected in Lynch's blood because of the volume of transfusions, would have corroborated and strengthened the lay witnesses' testimony that Lynch appeared to be "high" on PCP. If Dr. Dretchen had testified at trial, his testimony would have directly countered the medical examiner's autopsy report and his trial testimony, by explaining the significance of the presence of PCP in Lynch's urine and the relative insignificance of its absence in his blood, and it would have provided a basis to respond to (or would have inhibited) the prosecution's argument, emphasized in rebuttal, that the result of a blood test from Lynch's autopsy was "proof positive that [he] was not on PCP at the time of the shooting."[13] Dr. Dretchen, as an expert in the field, also would have authoritatively informed the jury of the medically recognized cognitive impacts of PCP intoxication. Instead, the jury was presented with counsel's unsupported argument in closing that "[Lynch] had PCP in his body. Those records, this isn't Ken Robinson talking, this is medical fact..... PCP ... [is] a hallucinate drug, you say things you don't really know what you are saying." As we said in Cosio, "[h]ad [Lynch's] credibility been impeached, it would have been a different trial, at least in the sense that

very different questions would have been put to the jury[,] [and] [h]ad the jury developed a reasonable doubt about [the victim's] credibility, there would have been a different verdict." 927 A.2d at 1134.

An expert, of course, could not have testified as to the *actual* effect any PCP in Lynch's body would have had at the time he made the accusatory statements based on the forensic testing that was available. But, as appellant argues, an expert would have been able to testify that Lynch *did* have PCP in his blood and his brain, and that it likely was not an insignificant amount, such that Lynch could have been suffering from the effects of PCP, making him confused, or even causing him to hallucinate, at the time he accused appellant of having shot him. Moreover, the expert's testimony would have been corroborated by (and would have corroborated) the testimony of witnesses who saw and talked to Lynch, and thought that he was acting as if he were under the influence of PCP. Freeman testified that "[Lynch] was high" and described Lynch's eyes as being "real glassy" and explained that "[Lynch] was just shaking," like someone on PCP. Officer Perkins testified that persons who suffer head trauma, like Lynch, "act just like people on PCP," explaining that patients high on PCP tend to act violently and are hard to restrain, as was Lynch.[14]

13. *Cf. Williams v. United States*, 642 A.2d 1317, 1321 (D.C.1994) ("In *Durant* ... [w]e held that a government expert's general statement that PCP stays in the urine for up to two weeks, and evidence of the defendant's positive urine test for PCP one day after the alleged crime, 'provided too slim a reed to support a conclusion that [the defendant] was under the influence of PCP at the time of [the charged] events, or had consumed PCP at such time as it would have been reasonable for the jury to infer that the PCP was affecting [his] behavior or ability to perceive and recall events.'" (all but first alteration original)

(quoting *Durant v. United States*, 551 A.2d 1318, 1328 (D.C.1988))).

14. Upon further inquiry, Officer Perkins said, "it [was] [n]ever in my mind that this patient was on PCP." We do not understand Perkins as unequivocally saying, as the government asserts, that he believed Lynch *was not* high on PCP; he might have meant that while treating Lynch, he had not considered that his patient might have been high on PCP. On the other hand, Christopher Wittington, the EMT who first treated Lynch, was explicitly asked whether Lynch appeared to be high on any drugs, to which he responded that he did not.

The impact of the expert's testimony has to be considered in the context of all the evidence presented at trial. Lynch's accusations of appellant were the linchpin of the government's case. Without his accusatory statements, or if the jury had doubts about their reliability, the government's evidence was entirely circumstantial and seriously contradicted by eyewitnesses. The government did establish a motive, appellant's "obsession" to exact revenge from Lynch for the "bad stuff," and presented three witnesses who said that appellant had made threatening phone calls to Lynch. The testimony about the import of appellant's threats was not consistent, however. Stephenson, who testified that she, Lynch, and appellant were "like family," said she thought appellant was "just playin'." Morton, on the other hand, testified that Lynch had been afraid and in hiding during the last two weeks of his life, and that when she called to tell appellant that Lynch had been shot, appellant said "I know" and asked "Is he dead? Is that motherfucker dead yet?"; Stephenson thought appellant did not "really care." Moreover, only one witness (Brown) actually placed appellant at the scene of the shooting, asking for Lynch, and said he heard the shots, but he did not see the shooting itself. But Brown's testimony was problematic because he said that the shooting occurred at 11:00 a.m., at odds with the testimony of all the other witnesses that Lynch was shot two hours later. See note 3, *supra*. The other witnesses who were at the scene either could not identify the shooter, said appellant did not match their description of the shooter, or in fact said someone *other* than appellant was the shooter. Furthermore, while appellant's fingerprint was found on the passenger-side rear window of Lynch's car, it was one of more than twenty found on the car, and its significance was ambiguous in light of the testimony of numerous witnesses that Lynch and appellant were, or had been, close friends, and Freeman's testimony that appellant had leaned into the car when he was talking to Lynch the day before he was shot. Additionally, appellant presented four witnesses who supported his alibi defense. If Lynch's drug-influenced identification of appellant were called into question, the defense's alibi witnesses might gain credibility in the jurors' eyes, and the government's circumstantial case might have been perceived as too weak to meet the government's burden of proof beyond a reasonable doubt.

The government emphasized the importance of Lynch's last words throughout the trial. Lynch's statements were the "vital clue"; "his words from the grave" were the first piece of evidence previewed in opening statement. Lynch's accusations that "Walter Johnson shot me" were repeated throughout the prosecutor's closing, and the last point made in rebuttal, reinforcing the government's theme that "[Lynch] left a message for the people who are going to seek justice in the case involving his death." And, with respect to defense counsel's argument in closing that Lynch's accusations should not be relied upon because Lynch was high on PCP, the government easily reminded the jury in rebuttal of the testimony of the medical examiner, as "proof positive that [Lynch] was not on PCP at the time of the shooting." The medical examiner's testimony and the prosecutor's forceful argument stood unrebutted; they could not be effectively countered by the defense except through expert testimony presented on behalf of appellant. As in opening state-

With expert medical testimony, counsel could have argued that what these emergency personnel observed, when considered in the context of the positive PCP tests (of which they were unaware), was likely the effect of PCP intoxication.

ment, the defense closing inconsistently argued that Lynch's statements were unreliable both because he was high on PCP and because Lynch had accused "Walter Johnson" and had not made it clear at the hospital that he meant "Butch" though he was "alert" and "conscious." [15]

In light of the government's otherwise circumstantial case and the emphasis the prosecutor placed on Lynch's repeated identification of appellant as the shooter, we conclude that there is a reasonable probability the outcome of this case would have been different. Pretrial consultation with an expert would have prepared counsel to assess the options available to present the most effective defense to Lynch's accusatory dying declarations. Had defense counsel successfully caused the jury to question, based on expert testimony, whether Lynch was high on PCP, "[t]he probability is high enough [that the jury might discredit or doubt Lynch's statements] that it undermines our confidence in the outcome of a trial in which appellant's sole accuser was not significantly impeached at all [and therefore] the proceeding was 'unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.' " *Cosio*, 927 A.2d at 1135 (quoting *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052); *see Chatmon*, 801 A.2d at 111–12 (posing the inquiry as "[whether] there is a reasonable probability that the jury would have had a reasonable doubt as to appellant's guilt, and, thus, that the outcome of his trial would have been different."). Because appellant's trial counsel "was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment," *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, appellant is entitled to a new trial.[16]

*Reversed and remanded.*

Dissenting opinion by Senior Judge FARRELL.

---

15. In closing, defense counsel argued that Lynch was "a man who had PCP, a hallucinogenic drug, who has gone into shock, who is non-responsive when the officers get there, and then when the medivac team gets there he is able to answer some questions." A few sentences later, however, counsel argued that Lynch had the "capability" to say "Butch shot me" because the "hospital records show when [Lynch] came in he was still alert. He was still conscious. He still had spontaneous eye movement."

16. The dissent comments that because Dr. Dretchen could testify only as to the possibility, but not the probability, that Lynch was suffering from the effects of PCP, his testimony would have been insufficient to create a reasonable probability of a different outcome. But that analysis imposes a higher burden on appellant than the law requires. The purpose of the defense is to raise a reasonable doubt in the mind of the jurors. In this case, doubt about the reliability of Lynch's statement, if based on the evidence, would be reasonable; the evidence need not itself establish a probability that Lynch was high on PCP. If the jury

had a reasonable doubt, there could be no conviction.

Expert medical testimony could have sowed such a doubt. From Dr. Dretchen's testimony about the "high cutoff level" of the test used to detect PCP in Lynch's body and the relatively small amounts required to cause mental confusion, disorientation and hallucinations, a juror could infer that there was more than a mere possibility that Lynch might have been under the effects of PCP when he made his accusatory statements, even if it could not be established as an actual fact. But even if the medical testimony could speak only to the possibility of PCP intoxication based on the test results, that testimony cannot be viewed in isolation. It would have corroborated the testimony of Freeman (himself a past PCP smoker), who said that Lynch was high on PCP and had "glassy eyes" and was "shaking" just before he was shot. And Lynch's combativeness, confusion and disorientation while he was being treated by the emergency personnel just after he was shot also would have taken a different cast if seen through the perspective of Dr. Dretchen's testimony that those are symptoms of PCP intoxication.

FARRELL, Senior Judge, dissenting:

Trial counsel for appellant, Kenneth Robinson, did essentially these things at trial: he extracted admissions from the government's two eyewitnesses that they could not identify the shooter of Parris Lynch and that appellant did not match the description of the shooter each had given; he called six witnesses to support appellant's defense of alibi; he called Curtis Freeman to explain the presence of appellant's fingerprint near a place on Lynch's rental car where the eyewitnesses had seen the shooter position himself, and also to testify that when Freeman saw Lynch shortly before the shooting Lynch appeared high on PCP; and he forcefully cross-examined all of the government witnesses, including those who had described appellant's threats toward Lynch. Thus, in most ways available to him, Robinson conducted the defense diligently and ably.

What he did not do was consult or call as a witness a medical expert (a) to establish that Lynch had PCP in his blood at the time he was shot and, shortly thereafter, made a dying declaration pivotal to the prosecution's case, and (b) to confirm the possible hallucinating effects of PCP consumption. For me, a close question thus exists of whether, without the distortions of hindsight, Robinson must be held to have constitutionally erred in his judgment—likely born of over-confidence in his ability otherwise to sow reasonable doubt—not to press his client or petition the court for funds to consult and engage a medical expert. The Supreme Court reminded us recently that, while "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, ... [t]here are ... 'countless ways to provide effective assistance in any given case,'" ·so that "[r]are are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington v. Richter*, —— U.S. ——, ——, 131 S.Ct. 770, ·788–89, 178 L.Ed.2d 624 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Robinson's concentration on mounting an alibi defense while discrediting the putative identifications of the prosecution eyewitnesses (and suggesting PCP intoxication through a lay witness and cross-examination of the paramedics) may seem short-sighted in retrospect, but does this mean it fell below the bedrock standard of professionalism reflected in *Strickland's* Sixth Amendment test? I find that a hard question to answer, particularly given the limitations Robinson could reasonably foresee, *infra*, on the help an expert would provide to appellant's case.[1]

---

The dissent's catalog of the evidence of appellant's motive to seek revenge on Lynch over a bad drug deal and Lynch's insistent statements that appellant shot him points to the undisputed fact that the government's case was sufficient to convict. And it may be that even if expert evidence such as Dr. Dretchen's were presented, the jury would eventually have been persuaded to convict. That is not the question. before us. Under *Strickland's* prejudice prong we must ask whether there is a reasonable probability that expert testimony, in the context of the other evidence at trial, would have created a reasonable doubt. For the reasons we have discussed in the text, we conclude that there is such a reasonable probability.

1. It is not important that Robinson at the § 23–110 hearing bemoaned his own failure to pursue the expert testimony issue, because

[a]fter an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of

Answering it is unnecessary in my view, however, because I am not persuaded that there is a reasonable probability—and not just the possibility—that expert testimony by Dr. Dretchen (or someone else) about PCP in Lynch's blood and its possible effects on the reliability of his dying statements would have caused the jury to find a reasonable doubt. The government states, and the court agrees, that "[t]he crucial issue at trial was whether Lynch was *actively* under the influence of PCP at the time of the shooting," so that his dying declaration was, as a matter of reasonable doubt, the product of hallucination sometimes associated with that drug. Br. for Appellee at 46 (emphasis added). But, although Dr. Dretchen would have testified that in fact (contrary to the medical examiner, Dr. Titus) Lynch had PCP in his blood at the time and that "[i]t is possible that Mr. Lynch was under the influence of" PCP (Dretchen Affidavit at 4), Dr. Dretchen could not say how much PCP was in Lynch's blood or when he had consumed it and thus how long it had been there. See Br. for Appellant at 36 ("[I]t was not possible, based on the available forensic evidence, to determine when Lynch last took PCP or how much was in his blood, and therefore it cannot be known whether he was under the active influence of the drug when he was shot."). Thus, the most appellant can claim, as his brief candidly states, is that "[i]f the jurors had heard Dr. Dretchen's testimony, they would have known *it was possible* that Lynch was on a hallucinogenic drug when he was shot and ... made the putatively damning statements to the paramedics." Br. for Appellant at 36 (emphasis added). Even with the shortcomings of the government's eyewitness evidence, it is hard for me to see how this testimony, alone or in the context of the other proof, would have created a reasonable probability of a different outcome.[2]

Underscoring the relative weakness of the inference Dr. Dretchen would have supported of an active, hallucinatory effect of the PCP on Lynch is the testimony the jury heard from the paramedics who were tending to Lynch when he made the dying statements. Christopher Whittington, who had treated patients high on PCP in the past, remembered that Lynch did not appear high on any kind of drug, although he was "somewhat combative" in the manner of dying patients Whittington had observed who exhibited a "feeling of impending doom." While "trying to judge [Lynch's] mental status" for signs of a possible head injury, Whittington asked Lynch simple questions, and the answers suggested that he was "mentally stable." Lynch looked Whittington "square in the eyes," said he "need[ed] to tell [him] something," and stated, "Walter Johnson shot me." Chris Perkins, also medically trained, confirmed that Lynch had "appear[ed] coherent" though in respiratory distress and "fighting for life," and seemed intent on "want[ing] to make sure [Perkins] understood what he was telling [him]" when he declared that appellant shot him. Asked if it was ever in his mind

---

counsel's performance, not counsel's subjective state of mind.
*Harrington*, 131 S.Ct. at 790.

**2.** The majority is right, of course, that the defense's job at trial was only to "raise a reasonable doubt in the mind of the jurors," not "establish a probability that Lynch was high on PCP." *Ante* at [658], n. 16. But on a post-conviction claim of ineffective assistance, the majority must agree that the defendant's task is the different and more demanding one of establishing "a reasonable probability that [the jury] would have returned with a different [verdict]" but for counsel's errors. *Wiggins v. Smith*, 539 U.S. 510, 536, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), quoted *ante* at [654].

that Lynch "was on PCP," Perkins said, "No," that again he "appeared to be somebody who was fighting for [his] life." Jurors weighing this testimony against Dr. Dretchen's opinion, in the abstract, that PCP "produces hallucinations," and that Lynch's symptoms of disorientation and combativeness were "consistent with somebody under the influence of PCP" but equally with "somebody who was dying," could readily have concluded that the one neutralized the other.

Beyond the limitations of what Dr. Dretchen would have told the jury, moreover, is a singular fact: The putatively hallucinating Lynch named as the shooter the one person who, according to multiple witnesses, had threatened to kill Lynch and showed a continual, indeed obsessive, interest in confronting him over a debt in the weeks and days before the killing. Catrina Stephenson, the mother of Lynch's children, testified that the formerly friendly relations between Lynch and appellant had turned sour over a drug deal gone bad and appellant's insistence that Lynch owed him money. Appellant began calling Stephenson about "every other day" stating that "[t]hat motherfucker gonna make me kill him" and "[h]e better get my money." Latoya Morton, Lynch's girlfriend, and Dorothy Murrell, Stephenson's mother, also received harassing and threatening phone calls from appellant. Almost daily in the month before Lynch's death, appellant would come to Morton's house looking for Lynch and threatening to start "snatching up kids," "blowing things up," and "doin' things." Lynch told Morton that the "beef" was over drugs that were "no good" and appellant's demand for his money back (some $6,000, according to Morton). Appellant likewise called Murrell's house "constantly," meaning every

day "around the clock," looking for Lynch "very aggressive[ly]." On the day of the murder, he again phoned her asking for Lynch. After Lynch was killed, the phone calls "stopped."

The majority finds inconsistencies in this testimony—much as a court might do in rejecting the government's reliance on motive testimony as adequate to show harmless error. But the burden in these post-conviction proceedings was on appellant, and the combined, mutually reinforcing testimony of these three witnesses could readily have caused the jury to ask, despite Dr. Dretchen's opinions, how a supposedly hallucinating Lynch just happened to name as his assailant the same person—the only one on this record—with a demonstrated motive to do him serious harm. Of course, we might speculate that Lynch's preoccupation itself with appellant's threats to his safety made appellant a "natural" choice for a hallucinating Lynch to name as his shooter. But imputing that kind of psychologizing to the jury is not something for which even Dr. Dretchen offered support.[3] And the objectivity of Lynch's fear of reprisal by appellant for a drug debt was substantiated by (a) the eyewitness Lee Benbow, who heard the shooter say "I want my damned money" before firing multiple shots into Lynch's car, and (b) Lawrence Brown, who was asked by appellant on the street that day whether he had seen Lynch, after which Brown heard shots fired minutes later and saw Lynch's car swerve off the road. In short, the hypothesis offered to support reasonable doubt—that only a drug-induced fantasy caused Lynch to name appellant as his shooter—loses much of its force considering that appellant alone on the record had Lynch in his sights.

---

**3.** One might as readily expect few if any limits on a hallucinator's reveries. Henry James on his deathbed thought he was the late emperor Napoleon.

For all of these reasons, I am not convinced that appellant has shown prejudice under *Strickland's* second prong, *i.e.*, more than a possibility that testimony by Dr. Dretchen would have added enough substance to the defense case to cause reasonable doubt in the jury's mind.[4] And, because appellant cannot overcome the plain error test in arguing separately (as he did not below) that the dying declarations were testimonial under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004),[5] I would affirm the judgments of conviction.

---

**4.** Appellant's other claims of ineffectiveness, as well as the sundry other assignments of error in his *pro se* submissions, likewise do not warrant relief.

**5.** Specifically, it is not "clear" or "obvious," *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), that dying declarations as a category or Lynch's dying statements in particular would be inadmissible under *Crawford. See, e.g. Michigan v. Bryant,* — U.S. —, —, 131 S.Ct. 1143, 1177, 179 L.Ed.2d 93 (2011) (Ginsburg, J., dissenting).