*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 18-CO-899

CHRISTIE CAROLYN JONES, APPELLANT

v.

UNITED STATES OF AMERICA, APPELLEE

Appeal from the Superior Court of the
District of Columbia
(CF3-16778-11)

(Hon. Heidi M. Pasichow, Trial Judge)

(Argued December 11, 2020                          Decided November 4, 2021)

*Jenifer Wicks* for appellant.

*Jessie K. Liu*, United States Attorney at the time, with whom, *Elizabeth Trosman*, *John P. Mannarino*, *Pamela Satterfield*, and *Sharon A. Sprague*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and DEAHL, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*:  Appellant Christie Carolyn Jones contends on appeal that the trial court erred in denying her motion to vacate her sentence under D.C. Code § 23-110 (2012 Repl.), on the grounds that she was denied her Sixth Amendment right to the effective assistance of counsel at trial because the

attorney failed to call an expert witness on eyewitness identification. Specifically, appellant alleges that the jury could not be as competent as the expert on eyewitness identification such that on its own it could properly consider the evidence and draw necessary conclusions. Additionally, appellant alleges that trial counsel was deficient for failing to seek witnesses to testify to appellant's movements on the morning of the offense. For these reasons appellant contends that the conduct of her court-appointed trial counsel fell below prevailing professional norms and that this deficient performance prejudiced appellant. We find appellant's contentions persuasive, and therefore vacate the convictions and remand for a new trial.

## I. Background

### A. Procedural History

Following her arrest on August 31, 2011, appellant was indicted on fourteen counts. A jury trial commenced on June 27, 2012, and on July 3, 2012, the jury

returned verdicts of guilty on nine counts.[1]  The remaining charges were dismissed by the government prior to trial.[2]

On September 27, 2012, the trial court sentenced appellant to a total of 156 months of incarceration, followed by a period of five years of supervised release. Appellant appealed, and this court affirmed appellant's convictions and remanded the case for re-sentencing because appellant was convicted of assault with a dangerous weapon, a lesser included offense of the conviction of assault with intent to commit robbery while armed.

Appellant, through her court-appointed counsel, moved to vacate her convictions pursuant to D.C. Code § 23-110 on May 13, 2016.  In response, the trial

---

[1] First Degree Burglary While Armed, in violation of D.C. Code §§ 22-801(a) (2012 Repl.), -4502 (2021 Supp.); Assault With Intent to Commit Robbery While Armed, in violation of D.C. Code §§ 22-401 (2012 Repl.), -4502 (2021 Supp.); two counts of Assault With a Dangerous Weapon, in violation of D.C. Code § 22-402 (2012 Repl.), Assault With Significant Bodily Injury, in violation of D.C. Code § 22-404(a)(2) (2012 Repl.); Carrying a Dangerous Weapon (outside home or a place of business), in violation of D.C. Code § 22-4505(a) (2021 Supp.); Second Degree Burglary, in violation of D.C. Code § 22-801(b) (2012 Repl.); four counts of Assault, Resisting, or Interfering With a Police Officer ("APO"), in violation of D.C. Code § 22-405(b) (2012 Repl.).

[2] The government dismissed the remaining five counts: four counts of APO and one count of Misdemeanor Sexual Abuse, in violation of D.C. Code § 22-3006 (2012 Repl.).

court granted appellant's request for a hearing on her motion in part[3] and ordered that the parties appear for a Post Disposition Motion hearing, to address the claims that trial counsel was ineffective for failing to call an expert in eyewitness identification and for failing to call other witnesses. On August 31, 2018, the trial court denied appellant's § 23-110 motion and this timely appeal followed.

### B.      Factual Background

At trial, complainant Benjamin Rushing testified that on the morning of August 30, 2011, he was lying in bed in the basement apartment of 1636 Fort Davis Street, N.W., Washington, D.C., when he awoke to a woman standing over him beside the bed. There were no lamps on in the bedroom, but the light in the fish aquarium was on and the shutters over the windows were half open. When Mr. Rushing told the woman to leave, she demanded he give her money and she threatened to hurt him. While Mr. Rushing attempted to leave the apartment, the woman then reached into a bag, retrieved a sock with a hard object in it, and hit Mr. Rushing on the head. Mr. Rushing was knocked down by the blow to the head and bled on the floor and the kitchen counter as the woman continued hitting him in the

---

[3] The trial court denied a hearing as to appellant's § 23-110 claims of failure to conduct professionally reasonable interview of victim, and failure to inform appellant of a plea offer.

back. The woman left the basement apartment, ran up the exterior steps of the residence, and entered the first floor of the house. Mr. Rushing then got up from the floor and went into his bathroom to wipe the blood off of his head. He then left the basement apartment and went outside where he saw his landlord, Robert Hartridge. Mr. Rushing told Mr. Hartridge that someone hit him over the head, and Mr. Hartridge called the police. When the police arrived, Mr. Rushing told the police that someone broke into his house and hit him over the head. Mr. Rushing described the perpetrator as a "sort of heavy-set lady" with brown skin, shoulder length red hair, wearing dark clothes, and carrying a dark bag.

Mr. Rushing was transported to Howard University Hospital, where the police showed him a nine-person photo array. Mr. Rushing did not pick appellant out of the photo array. At trial, Mr. Rushing testified that he did not have any physical conditions that would affect his ability to understand what was happening on the morning of the incident and that he was not under the influence of any medication, drugs, or alcohol that would influence his perception. Mr. Rushing additionally stated that he almost lost consciousness after the perpetrator hit him over the head and that he was "weak, bloody, and blurry."

Mr. Rushing made an in-court identification of appellant at trial, despite previously being unable to identify appellant in a photograph array when he was still in the hospital following the assault. The bloody towel and Mr. Rushing's bloody T-shirt were admitted into evidence, as were photographs of the blood-stained kitchen floor, Mr. Rushing's appearance on the day of the crime, and Mr. Rushing's injuries.

The government also called Mr. Hartridge as a witness. Mr. Hartridge explained that he rented the house to three people, including Mr. Rushing, and that he lived next door. Mr. Hartridge testified that on the morning in question, he drove another tenant to work and returned to his house between 6:00 and 6:30 A.M. He then parked his car in the rear of the house and went to the front of the house to pick up his newspaper. Mr. Hartridge noticed that the front door to 1636 Fort Davis Street was open and called the tenant who lived on that floor to confirm that he had locked the front door before he left. Mr. Hartridge heard a "running noise" inside of 1636 Fort Davis Street so he entered the house and yelled to inquire if anyone was there. He saw a woman walk down the interior steps of the house wearing "something dark" and carrying a "shiny object" in her hand. Mr. Hartridge made an in-court identification of appellant. When asked to describe the perpetrator, Mr. Hartridge pointed at appellant stating that appellant was "the lady that was coming down the

steps" and "she's the lady that ran me out of my house." Mr. Hartridge could not describe the size of the object, nor could he recall in which hand the object was held. He stated, "I'm really not really trying to look to see exactly what it was or—but I know it's something in her hand." Mr. Hartridge elaborated that the woman pointed the shiny object at him, and he backed out of the front door and down the front steps of 1636 Fort Davis Street with the woman following him. When testifying about the perpetrator pointing the "shiny object" at him, Mr. Hartridge "used his right hand to make a jabbing motion." Mr. Hartridge recounted that the perpetrator was approximately four feet away from him as she backed him out of the house. He then "chased [the perpetrator] out of the yard" with a stick and followed her south along a stone path that ran next to the house. Mr. Hartridge further testified that, throughout the entire incident, he did not recall whether or not he was wearing his prescription glasses, though there were no "obstructions" in the way of seeing the perpetrator's face. Mr. Hartridge testified that the time between his first seeing the perpetrator and the perpetrator running away was "a minute." Although he could not recall if a light had been on inside the house, "it wasn't dark" when he saw the perpetrator.

After the perpetrator fled, Mr. Hartridge walked back to the front of house where he saw Mr. Rushing come out of the basement apartment. Mr. Hartridge saw

that Mr. Rushing "had blood all over him," which appeared to be coming from Mr. Rushing's head. Mr. Hartridge then called 911. During the 911 call, Mr. Hartridge described the perpetrator as "about five feet and 140 pounds" and "dark skinned." [4] The police arrived on the scene about five minutes after Mr. Hartridge called 911.

As he was speaking to the police outside, Mr. Hartridge saw appellant standing on the sidewalk in front of 1636 Fort Davis Street, asking what was happening. Mr. Hartridge did not see appellant walk up or the direction from which she approached. According to Mr. Hartridge, appellant was standing about two feet away from him and he recognized appellant as the perpetrator because he "had just seen her" and because of "her size and complexion." Mr. Hartridge testified that "[a]pproximately, a half hour'' passed between seeing the perpetrator in 1636 Fort Davis Street and seeing appellant on the sidewalk in front of the house.

District of Columbia Metropolitan Police Department Officer Heriberto Lucena processed the crime scene and recovered a crystal replica of a baseball that

---

[4] In addition, Metropolitan Police Department Detective Simon Yammie testified at trial that the dispatched lookout call was for a "heavy-set black female; shoulder length hair, straight; approximately five-ten in height wearing – carrying a black backpack." It is undisputed that when appellant was arrested, she was measured to be between five-eight to five-ten feet tall, had braided hair, and was heavy set. On appeal, the parties are not disputing the witnesses gave inconsistent descriptions of the assailant.

was wrapped inside two socks and admitted into evidence at trial. Officer Lucena attempted to recover fingerprints from the baseball but was unsuccessful.

At trial, the defense called Diane Wilks as a witness. Diane Wilks worked as a Criminal Justice Act Investigator. Investigator Wilks interviewed Mr. Rushing at 1636 Fort Davis Street on February 25, 2012, as part of the defense's preparation for trial. Investigator Wilks testified that she took crime scene photos and walked through the interior and exterior of 1636 Fort Davis Street. On February 25, 2012, approximately six months after the crime took place, Investigator Wilks also presented Mr. Rushing with a nine-photograph photo array that included a photo of appellant, and asked Mr. Rushing if he could identify the perpetrator. Mr. Rushing did not select appellant in the photo array, but instead pointed to another person in the photo array and stated that the perpetrator had hair similar to the person in that photograph. Investigator Wilks interviewed Mr. Rushing for approximately an hour but did not make an audio recording of the interview or take a written statement from Mr. Rushing.

Investigator Wilks further stated that she did not record how long Mr. Rushing viewed the photo array, did not record any instructions she gave Mr. Rushing before he viewed the array, and did not have Mr. Rushing circle the photograph he selected.

Investigator Wilks testified that she usually calls attorneys to give the results of her investigations, but sometimes writes memorandum to the attorney describing the investigation. In this case, Investigator Wilks recounted that she wrote a memo regarding her interview with Mr. Rushing.

Appellant's mother, Diane Jones, also testified at trial, but her testimony pertained only to the APO charges not at issue in appellant's § 23-110 motion. She was not asked any questions about appellant's activities prior to the time of her appearance on the sidewalk outside of 1636 Fort Davis Street.

## C.    The § 23-110 Evidentiary Hearing

Appellant's motion to vacate under D.C. Code § 23-110 asserted four ineffective assistance of counsel claims. Appellant argued that trial counsel was ineffective for: (1) failing to seek witnesses to testify to her movements on the morning of the instant offense; (2) failing to conduct a professionally reasonable interview with the victim, Mr. Rushing; (3) failing to call an expert in eyewitness identification; and (4) failing to convey a plea offer to her. The trial court granted a hearing on appellant's motion with regard to two of her claims: (1) failing to seek

witnesses to testify to her movements on the morning of the crime and (3) failing to call an expert in eyewitness identification.

At the evidentiary hearing, the government presented testimony from appellant's trial counsel. Appellant presented the testimony of an eyewitness-identification expert, Dr. Steven Penrod, which she contended should have been presented at trial.[5]

Trial counsel testified that, in consultation with appellant, he decided on a misidentification defense highlighting the inconsistencies and inaccuracies in the many descriptions given by the two witnesses, as well as the fact that Mr. Rushing twice failed to identify appellant from a photo array. Counsel testified that he did not consider calling an expert in eyewitness identification because he thought the identification evidence was already weak. If the identification evidence had been stronger, an expert might be helpful "to show that different stresses and trauma of the event could actually alter the person's perception." "But in this case, it was unnecessary," and "strategically, we didn't think that we needed it," counsel explained.

---

[5] Appellant also presented testimony of her sister, Shawn Jones; her niece, Asia Jones; and her mother, Diane Jones. Appellant also testified.

Dr. Steven Penrod was qualified as an expert in eyewitness identification. Based primarily on the evidence as recounted in the government's opposition to appellant's § 23-110 motion, Dr. Penrod opined that factors such as the presence of a weapon, high stress levels, and the length of time the witness was exposed to the perpetrator, reduce the reliability of eyewitness identifications. Dr. Penrod also testified that various issues with memory, including age, poor recognition of physical characteristics, and the concept of transference — the phenomenon "in which an innocent person who has been seen by a witness before an identification procedure is at enhanced risk of being misidentified as a perpetrator" — could contribute to unreliable identifications.

Dr. Penrod also testified that there is substantial disagreement among lay people as to the effect of the factors that he described. Further, he testified that testimony by experts can be helpful in explaining these phenomena to jurors, but that the presentation of this material in arguments by counsel was not helpful because, in part, jurors tended to not trust representations or arguments by counsel. He also noted that studies have shown that there was a substantial error rate amongst people who were highly confident of their identification.

**D.     The Trial Court's Order**

The trial court denied appellant's motion, finding that any failure to investigate and call witnesses to appellant's movements on the morning of the crime "did not rise to the level of ineffective assistance of counsel." It explained that counsel's choice not to elicit alibi testimony was a reasonable strategic decision that was not prejudicial. Likewise, the trial court found that it was professionally reasonable not to call appellant's sisters as trial witnesses.

Next, the trial court concluded that counsel's performance in handling Investigator Wilks's interview of Mr. Rushing did not prejudice appellant. The court reviewed the investigatory steps taken by Investigator Wilks, including her presentation of the photo array. The court found that Investigator Wilks had memorialized her interview with Mr. Rushing — including the fact that Mr. Rushing said the assailant had hair like number nine — in "a written investigative memo on February 26, 2012, the day after her interview with Mr. Rushing and four months before trial."

The court did not determine whether the manner in which counsel handled Mr. Rushing's interview was deficient. Instead, it concluded that any deficiency did

not prejudice appellant "because [counsel] still had the opportunity to interview and subsequently cross-examine Mr. Rushing during the trial about the contents in the investigator's memo," and to argue it effectively to the jury.

Finally, the court found that counsel's "decidedly strategic" decision not to call an eyewitness-identification expert was not deficient. Counsel's decision was "part of a strategy under which, given the wealth of evidence he had," gave him "good reason to think further investigation into misidentification would be a waste of time and resources."

The court held that failing to call an expert could be deficient "if the expert would have presented information that was not otherwise communicated to the jury." *See Kigozi v. United States*, 55 A.3d 643 (D.C. 2012). But here, the court found that counsel had "demonstrated the same key points at trial" — including "[w]eapon focus, high stress situation, and short exposure time" — "that the expert in eyewitness identification presented at the motions hearing," and they were all "factors that [counsel] cited as sources of reasonable doubt that could contribute to the misidentification of [appellant] as the perpetrator." For the same reasons, the court further found that any deficiency was not prejudicial, because "any evidence the expert would have presented would have been cumulative."

## II.    Legal Standard and Applicable Principles

"For purposes of appellate review, the trial court's determination of whether counsel was ineffective presents a mixed question of both law and fact. We must accept the trial court's factual findings unless they lack evidentiary support in the record, but we review the trial court's legal determinations de novo."  *Turner v. United States*, 166 A.3d 949, 953 (D.C. 2017) (cleaned up) (quoting *Otts v. United States*, 952 A.2d 156, 163 (D.C. 2008)).    We defer to a judge's reasonable "credibility determinations" because such determinations are "the appropriate function of the fact finder."  *Gaulden v. United States*, 239 A.3d 592, 597 (D.C. 2020).  However, "we owe no deference . . . on the ultimate question of law."  *Curry v. United States*, 498 A.2d 534, 540 (D.C. 1985).

The Sixth Amendment right to counsel in criminal prosecutions is a right to "reasonably effective" counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To show that his trial counsel's performance was deficient, appellant must 'show[] that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"  *Kigozi*, 55 A.3d 643, 651

(D.C. 2012) (quoting *Strickland*, 466 U.S. at 687). Accordingly, appellant must satisfy a two-part test.

First, she must show that her attorney made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," i.e., that, considering all the circumstances as they appeared, "counsel's representation fell below an objective standard of reasonableness" and "prevailing professional norms." *Strickland,* 466 U.S. at 687-88, 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Cosio v. United States*, 927 A.2d 1106, 1123 (2007) (quoting *Strickland*, 466 U.S. at 689). We do not "second-guess trial counsel's strategic choices because 'many alternative tactics are available to defense attorneys and their actions are often the products of strategic choices made on the basis of their subjective assessment of the circumstances at trial.'" *Chatmon v. United States*, 801 A.2d 92, 107 (D.C. 2002) (quoting *Zanders v. United States*, 678 A.2d 556, 569 (D.C. 1996)); *see also Carter v. United States*, 475 A.2d 1118, 1123 (D.C. 1984) ("Tactical decisions which may go awry at trial do not constitute ineffectiveness, nor do errors in judgment which become apparent in light of well-reasoned hindsight.").

Second, even if counsel's representation was deficient, appellant must show prejudice — i.e., "a probability sufficient to undermine confidence in the outcome" — that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 691-92, 694; *see also Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (defendant must show "a substantial, not just conceivable, likelihood of a different result"); *Young v. United States*, 56 A.3d 1184, 1199 (D.C. 2012) ("[C]ounsel's deficiency must have resulted in substantial prejudice.").

### III.   Analysis

"In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. "The adversarial process on which our system relies requires adequate preparation by defense counsel." *Kigozi*, 55 A.3d at 650-51. Thus, "it has long been the rule that counsel's investigation before trial is an essential component of effective representation and can be as important to the defense as counsel's performance during trial." *Id.* "[C]ounsel has

a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Thus, counsel's arbitrary or ill-considered decision to forgo relevant pretrial investigation is constitutionally deficient. *See Cosio*, 927 A.2d at 1123; *Andrus v. Texas*, 140 S.Ct. 1875, 1882-83 (2020); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) ("[C]ounsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

## A. Deficiency Prong

On several occasions we have clarified how counsel's failure to consult with an expert and present expert evidence at trial falls below professional norms. In *Kigozi v. United States*, the appellant filed a motion pursuant to D.C. Code § 23-110 seeking reversal of his murder conviction on the ground of ineffective assistance of counsel. The petitioner claimed counsel fell below professional norms by failing to consult with and call an expert witness who could testify about the PCP intoxication of the decedent, whose dying declarations formed the centerpiece of the government's case. 55 A.3d at 651. Expanding upon the principles we outlined in *Cosio*, we reversed the appellant's murder conviction and remanded the case for a new trial. *Id.* at 658. We determined it was unreasonable that counsel, upon learning

pretrial that the key witness for the prosecution may have been under the influence of a mind-altering drug, did not further investigate any potential for impeaching this witness's incriminating statements. *Id.* at 651. Furthermore, we concluded that there was a reasonable probability the outcome of this case would have been different, had the defense counsel successfully caused the jury to question the credibility of the decedent's statements. *Id.* at 655. Because trial counsel "was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," *Strickland*, 466 U.S. at 687, appellant was entitled to a new trial.

Similarly, in *Young v. United States*, we held that trial counsel's failure to consult with an expert before trial and present expert testimony at trial fell below the norm of reasonable professional standards and that this deficiency prejudiced the defense. 56 A.3d at 1187. In his § 23-110 motion, the appellant argued that trial counsel was constitutionally ineffective for not presenting a narcotics expert witness at trial to challenge the officers' accounts of the drug transaction they said they observed, which were the centerpiece of the government's case. *Id.* at 1194-95. Relying on *Kigozi* and *Cosio*, the *Young* court held that the trial court erred in characterizing defense counsel's failure to call an expert as a "strategic" choice. *Id.* at 1202. Though counsel stated that he "rarely found the testimony of experts to be helpful to the defense in drug cases," he did not consult an expert because it "didn't

occur to [him] to do that." *Id.* at 1198. "In other words, this was an omission, not a strategic decision." *Id.*

*Kigozi* and *Young* thus stand for the proposition that professional norms require counsel, when appropriate, to explore calling an expert witness in certain circumstances. In assessing the need for an expert, the operative question is whether expert testimony would "help the trier of fact to understand the evidence or determine a fact in issue." *Motorola v. Murray*, 147 A.3d 751, 756-57 (D.C. 2016) (retiring the *Dyas* test and adopting the federal test for the admission of expert testimony under *Daubert*/Federal Rule of Evidence Rule 702); *see also Jackson v. United States*, 210 A.3d 800, 805-06 (D.C. 2019) (assessing "whether the jurors are 'just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions.'") (emphasis and quotations omitted).[6] Furthermore, "the evaluation of juror competence may vary with the issue being addressed." *Id.* at 806.

We find an example of such issue here, where, in addition to the "inherent unreliability" of eyewitness identification evidence, *Watkins v. Sowders*, 449 U.S.

---

[6] We do not invite any defaults back to the now retired standard of *beyond the ken*, and emphasize the new standard for assessing the need of an expert — 'help the trier of fact to understand the evidence or determine a fact in issue' — as announced in *Motorola*, 147 A.3d at 756-57.

341, 352 (1981), many jurors have basic misunderstandings about the way memory works and about specific circumstantial factors that can affect the reliability of eyewitness identifications.

As we have recognized, the state of social science research with respect to the reliability of eyewitness testimony has progressed to widespread acceptance among experts. *Benn v. United States*, 978 A.2d 1257, 1278-79 (D.C. 2009). "Whereas once we could only speculate as to the inaccuracy of an eyewitness identification, now there is published scientific research that questions its accuracy when made under certain conditions and exonerations, based on DNA evidence, that confirm what previously were only suspicions." *Id*.

"[M]emory does not act like a videotape recorder, but rather is subject to numerous influences that continuously alter its content." *People v. Shirley*, 723 P.2d 1354, 1377 (Cal. 1982). In other words, memory is constructive and dynamic. *See State v. Henderson*, 27 A.3d 872, 894 (N.J. 2011); *State v. Martinez*, 478 P.3d 880, 896 (N.M. 2020). Courts across the country now accept that certain factors can greatly affect the accuracy of eyewitness identification testimony. A non-exhaustive list of factors includes: (1) transference, which occurs when a person seen in one

context is confused with a person seen in another;[7] (2) the weak correlation between confidence and accuracy regarding an identification;[8] (3) the diminishing reliability of an identification caused by the witness's focus on a weapon;[9] and (4) the negative impact of high stress at the time of the observation on the ability to retain an accurate perception of events.[10] We reiterate that numerous other factors are generally accepted as well. *See S. Kassin et al.*, "On the 'General Acceptance' of Eyewitness

---

[7] *See, e.g.*, *United States v. Harris*, 995 F.2d 532, 535 (4th Cir. 1993); *United States v. Smith*, 736 F.2d 1103, 1106 (6th Cir. 1984).

[8] *See, e.g.*, *United States v. Williams,* 522 F.3d 809, 811 (7th Cir. 2008); *United States v. Brownlee,* 454 F.3d 131, 142 n. 9, 144 (3d Cir. 2006); *United States v. Stevens,* 935 F.2d 1380, 1400 (3d Cir. 1991); *United States v. Moore,* 786 F.2d 1308, 1312 (5th Cir. 1986); *People v. McDonald,* 690 P.2d 709, 721 (Cal. 1984), overruled in part on other grounds by *People v. Mendoza,* 23 Cal. 4th 896 (2000); *Johnson v. State,* 526 S.E.2d 549, 552 n.2 (Ga. 2000); *People v. Young,* 7 N.Y.3d 40, 43 (2006); *see also State v. Ledbetter,* 881 A.2d 290, 316-17 (Conn. 2005) ("[T]he correlation between witness confidence and accuracy tends to be weak, and witness confidence can be manipulated.").

[9] *Benn*, 978 A.2d at 1271; *see also, e.g.*, *Brownlee*, 454 F.3d at 136-37; *Smith*, 736 F.2d at 1106; *United States v. Lester*, 254 F. Supp. 2d 602, 612 (E.D.Va. 2003); *People v. Cornwell*, 37 Cal. 4th 50, 78, 80 (2005), overruled in part on other grounds by *People v. Doolin*, 45 Cal. 4th 390 (2009); *Commonwealth v. Christie*, 98 S.W.3d 485, 490 (Ky. 2002).

[10] *See, e.g.*, *United States v. Downing*, 753 F.2d 1224, 1231 (3d Cir. 1985); *United States v. Smith*, 621 F. Supp. 2d 1207, 1216 (M.D. Ala. 2009); *State v. Chapple*, 660 P.2d 1208, 1221 (Ariz. 1983); *Brodes v. State*, 614 S.E.2d 766, 768-69 (Ga. 2005); *Young*, 7 N.Y.3d at 43; *State v. Bradley*, 907 N.E.2d 1205, 1207-08 (Ohio Ct. App. 2009).

Testimony Research: A New Survey of the Experts," 56 Am. Psychologist 405, 407-11 (2001).

However, whether experts generally accept the science on the reliability of eyewitness testimony is only part of the necessary inquiry; the determinative question is whether expert testimony would "help the trier of fact to understand the evidence or determine a fact in issue." *Motorola*, 147 A.3d at 756-57; *see also Jackson*, 210 A.3d at 805-06 (holding that expert testimony can be helpful where jurors are not "just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions") (citing *Minor v. United States*, 57 A.3d 406, 415 (D.C. 2012)) (emphasis omitted) (quoting *Adams v. United States*, 502 A.2d 1011, 1021-22 (D.C. 1986)).[11]

Here, the answer is yes. Although these findings are widely accepted by scientists and, to a lesser extent, recognized by judges and attorneys,[12] they remain

---

[11] While *Jackson v. United States*, 210 A.3d at 805-06, does not specifically reference this court's recent adoption of Federal Rule of Evidence Rule 702, it stresses the importance of expert testimony needing to be helpful to the fact finder or jury, which may not be as competent as an expert, but which is what Rule 702 requires.

[12] A few studies have assessed attorneys' understanding of eyewitness reliability variables. All of these studies, however, involve small samples and some

largely unfamiliar to the average person and often run counter to the beliefs of jurors.[13] As the Seventh Circuit Court of Appeals explained:

> It will not do to reply that jurors know from their daily lives that memory is fallible. The question that social science can address is how fallible, and thus how deeply any given identification should be discounted. That jurors have beliefs about this does not make expert evidence irrelevant; to the contrary, it may make such evidence vital, for if jurors' beliefs are mistaken then they may reach incorrect conclusions. Expert evidence can help jurors evaluate whether their beliefs about the reliability of eyewitness testimony are correct.

---

date from the early 1980s. *See* Jennifer Devenport et al., *Eyewitness Identification Evidence*, 3 Psychol. Pub. Pol'y & L. 338 (1997) (citing studies). These studies focused primarily on the understandings of judges and attorneys, and their results indicate that these two groups have a generally sound understanding of the factors that may impact the reliability of eyewitness testimony. *See id.*

[13] *See, e.g.*, *Brownlee*, 454 F.3d at 142 ("[W]hile science has firmly established the inherent unreliability of human perception and memory . . . this reality is outside the jury's common knowledge, and often contradicts jurors' commonsense understandings.") (cleaned up); *United States v. Smithers*, 212 F.3d 306, 312 n.1 (6th Cir. 2000) ("[B]ecause many of the factors affecting eyewitness impressions are counter-intuitive, many jurors' assumptions about how memories are created are actively wrong.") (internal quotations omitted); *Moore*, 786 F.2d at 1312 ("Expert testimony on eyewitness reliability is not simply a recitation of facts available through common knowledge. Indeed, the conclusions of the psychological studies are largely counter-intuitive, and serve to explode common myths about an individual's capacity for perception.") (internal quotations omitted).

*United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009). Indeed, the trend amongst courts is toward greater acceptance of the need for expert testimony regarding the factors that may affect eyewitness identification. In a 2012 decision, the Connecticut Supreme Court emphasized that "the widespread judicial recognition that eyewitness identifications are potentially unreliable *in a variety of ways unknown to the average juror*." *State v. Guilbert*, 49 A.3d 705, 720 (Conn. 2012) (emphasis added).[14]

---

[14] *See, e.g.*, *Ferensic v. Birkett*, 501 F.3d 469, 482 (6th Cir. 2007) ("[E]xpert testimony on eyewitness identifications . . . is now universally recognized as scientifically valid and of aid [to] the trier of fact for admissibility purposes.") (internal quotation marks omitted); *Smithers*, 212 F.3d at 313 (noting that "the science of eyewitness perception has achieved the level of exactness, methodology and reliability of any psychological research") (internal quotation marks omitted); *Moore*, 786 F.2d at 1312 ("This [c]ourt accepts the modern conclusion that the admission of expert testimony regarding eyewitness identifications is proper . . . . We cannot say [that] such scientific data [are] inadequate or contradictory. The scientific validity of the studies confirming the many weaknesses of eyewitness identification cannot be seriously questioned at this point.") (internal quotation marks omitted); *Downing*, 753 F.2d at 1242 (noting "the proliferation of empirical research demonstrating the pitfalls of eyewitness identification" and that "the consistency of the results of these studies is impressive") (internal quotation marks omitted); *State v. Henderson*, 27 A.3d 872, 877-78 (N.J. 2011) (noting that, "[f]rom social science research to the review of actual police lineups, from laboratory experiments to DNA exonerations, [scientific research and studies demonstrate] that the possibility of mistaken identification is real," that many studies reveal "a troubling lack of reliability in eyewitness identifications," and that "[t]hat evidence offers convincing proof that the current test for evaluating the trustworthiness of eyewitness identifications should be revised"); *People v. LeGrand*, 8 N.Y.3d 449, 455 (2007) ("[E]xpert psychological testimony on eyewitness identification [is] sufficiently reliable to be admitted, and the vast majority of academic commentators have urged its acceptance . . . . [P]sychological research data [are] by now abundant,

This broad judicial acceptance aligns with a near universal scientific consensus.[15] And ultimately, scientific findings show that judicial intuition concerning jurors' knowledge of eyewitness testimony is flawed.

---

and the findings based [on the data] concerning cognitive factors that may affect identification are quite uniform and well documented. . . .") (cleaned up); *State v. Copeland*, 226 S.W.3d 287, 299 (Tenn. 2007) (discussing that "[s]cientifically tested studies, subject to peer review, have identified legitimate areas of concern" in the area of eyewitness identifications); *Tillman v. State*, 354 S.W.3d 425, 441 (Tex. Crim. App. 2011) ("[E]yewitness identification has continued to be troublesome and controversial as the outside world and modern science have cast doubt on this crucial piece of evidence . . . . [A] vast body of scientific research about human memory has emerged. That body of work casts doubt on some commonly held views relating to memory . . .") (internal quotation marks omitted); *State v. Clopten*, 223 P.3d 1103, 1108 (Utah 2009) ("[E]mpirical research has convincingly established that expert testimony is necessary in many cases to explain the possibility of mistaken eyewitness identification.").

[15] *See, e.g.*, K. Deffenbacher et al., *Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation,* 14 J. Experimental Psychol.: Applied 139, 147-48 (2008); K. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 Law & Hum. Behav. 287, 306 (2006); K. Deffenbacher et al., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 Law & Hum. Behav. 687, 699-704 (2004); A. Douglass & N. Steblay, *Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect*, 20 Applied Cognitive Psychol. 859, 864-65 (2006); S. Kassin et al., *On the 'General Acceptance' of Eyewitness Testimony Research: A New Survey of the Experts*, 56 Am. Psychologist 405, 405-06 (2001); N. Steblay, *A Meta-Analytic Review of the Weapon Focus Effect*, 16 Law & Hum. Behav. 413, 413, 420-22 (1992).

Thus, in this instance, the evidence reinforces the widely-held view that members of the jury are decidedly *not* "as competent as the expert" in considering and weighing eyewitness evidence to draw the appropriate and necessary conclusions. *Jackson*, 210 A.3d at 805-06 (quotations omitted). This conclusion matches the § 23-110 testimony offered by Dr. Penrod, who stated that lay people "disagree amongst themselves about the effects of these factors on identification accuracy." We are convinced that a satisfactory understanding of the eyewitness testimony reliability factors "require[s] information beyond that ordinarily attributable to the average juror." *Durant v. United States*, 551 A.2d 1318, 1328 n.12 (D.C. 1988) (quoting J. Weinstein & M. Berger, 3 Weinstein's Evidence ¶ 607[04], 607-61). Such relevant phenomena here may include, but is not limited to, the accuracy-confidence correlation, the effect of stress, time estimates, and weapons focus. Given the wealth of scientific evidence depicting (1) the presence of numerous reliability factors and (2) the common misconceptions of lay people regarding such factors, we conclude that this situation — one in which the government's case hinged primarily on the credibility of eyewitness testimony — is one in which professional norms require counsel to explore whether an expert's testimony would be beneficial and calling an expert witness to testify. Accordingly, appellant has shown that the failure to do so in this case amounts to deficient performance under *Strickland*.

## B.    Prejudice Prong

Deficient performance alone, however, is not enough to warrant reversal; counsel's deficiency must have resulted in substantial prejudice. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. For appellant's claim of prejudice based on an investigative omission to succeed, he must make a two-stage showing. First, he must show there is a "reasonable probability" that "a competent attorney, aware of [the expert opinion], would have introduced it" at trial, *Cosio*, 927 A.2d at 1132 (quoting *Wiggins*, 539 U.S. at 535). Second, he must show a reasonable probability that the jury would have accepted the expert opinion enough to return a different outcome. *Id.*

We have repeatedly emphasized that there is a "critical difference between reasonable 'probability' and 'possibility' of a different outcome." *See*, *e.g.*, *Benton v. United States*, 815 A.2d 371, 374 (D.C. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 291 (1999)). It bears repeating that a reasonable probability, while more than

a mere possibility, does not require that counsel's conduct "more likely than not" altered the outcome. *Id.* (quoting *Strickland*, 466 U.S. at 693-94). Moreover, what constitutes a "reasonable probability" of a different outcome has to be measured by reference to "the purpose of the defense [which] is to raise a reasonable doubt in the jurors' minds." *Kigozi*, 55 A.3d at 658 n.16 ("[T]he evidence need not itself establish a probability . . . [i]f the jury had a reasonable doubt, there could be no conviction.").

A deficient performance by counsel may not always prejudice a defendant if the "main thrust" of counsel's argument is still presented to the jury. *Curry v. United States*, 498 A.2d 534, 543 (D.C. 1985) (finding no prejudice where "the main thrust" of any defense was presented through examination of witnesses); *see also Wingate v. United States*, 669 A.2d 1275, 1278-79 (D.C. 1995). In *Wingate*, we held that failure to contact two potential alibi witnesses until two weeks before trial, failure to contact two other potential alibi witnesses until trial, and failure to listen to the radio run or view police photographs of the crime scene before trial was deficient performance. *Id*. at 1278-79. We determined, however, that the defendant was not prejudiced by this error because any evidence that would have been presented by the witnesses had already been presented to the jury, and any additional evidence would have been "cumulative." *Id*. at 1279.

Here, the government argues, and the trial court concluded, that the failure to call an expert did not prejudice appellant because trial counsel still conveyed the main thrust of his argument and that any evidence an expert would have presented would have been cumulative. We disagree. During the trial, counsel, acting as an advocate for his client, elicited general information from the witnesses and discussed the implications of some eyewitness identification reliability factors as he developed the defense theory of misidentification. On cross-examination, trial counsel elicited that Mr. Hartridge was focused on the shiny object in the perpetrator's hand while he was backing out of the house, rather than looking at or thinking about the physical characteristics of the perpetrator. Counsel later reminded the jury of this evidence during closing statements, emphasizing how the witness focused on the shiny object he perceived as a weapon, backed away as he feared for his life, and had "at most a split second to look at" the perpetrator. While trial counsel may have alluded to the existence of some issues surrounding eyewitness reliability after the eyewitnesses had testified, he did not provide the explicit and detailed testimony that an expert would likely offer.[16]

---

[16] Dr. Penrod testified that while expert testimony can help inform the jury of the aforementioned reliability factors, in general, the testimony of "[c]ounsel is not very good, in part because . . . jurors don't trust representations or arguments by counsel."

Here, there is a reasonable probability that scientific testimony from an eyewitness expert, in the context of the other evidence at trial, would have created a reasonable doubt sufficient to forestall conviction. For example, if an objective expert on eyewitness identification had testified regarding Mr. Hartridge's identification of appellant, offering robust scientific context regarding the "weapon focus" phenomenon, there is a reasonable probability that the jury would have questioned the reliability of the identification.[17] Had trial counsel successfully caused the jury to question, based on expert testimony, the reliability of the eyewitnesses' accounts, the probability that the jury might discredit the testimony of Mr. Rushing and Mr. Hartridge — one of whom twice was unable to identify appellant from a photo array and both for whom there were numerous reliability factors at issue — is substantial enough that it undermines our confidence in the outcome of the trial.

We therefore conclude that the proceeding was "unreliable because of a breakdown in the adversarial process that our system counts on to produce just

---

[17] Additionally, when Dr. Penrod was asked what, in his opinion, the effect of the stress experienced by the witnesses in this case would be on the reliability of their identifications, he answered: "In both instances they strike me as the kinds of stress that would produce impaired identification accuracy."

results." *Cosio*, 927 A.2d at 1135 (citing *Strickland*, 466 U.S. at 696); *see Chatmon*, 801 A.2d at 111-12 (posing the inquiry as "[whether] there is a reasonable probability that the jury would have had a reasonable doubt as to appellant's guilt, and, thus, that the outcome of his trial would have been different"). Because appellant's trial counsel "was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," *Strickland*, 466 U.S. at 687, we vacate appellant's convictions and remand for a new trial.[18]

*So ordered.*

---

[18] With the issuance of this opinion, we deny appellant's counsel's October 4, 2021, motion to withdraw as moot.